## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARK HALL, an individual, and** | ) | |
| **REBEKAH HALL, an individual,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 24-CV-402-JFJ** |
| | ) | |
| **ARMIS, LLC, a foreign corporation, and** | ) | |
| **HOMESAFE, LLC, a foreign corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court is the Motion to Compel Arbitration and to Dismiss (ECF No. 9), filed by Defendants Armis, LLC ("Armis"), and HomeSafe, LLC ("HomeSafe") (collectively "Defendants"), against Plaintiffs Mark and Rebekah Hall (collectively "Plaintiffs"). The parties have consented to a magistrate judge presiding over the case. ECF No. 27.

For reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART. The Court concludes that Plaintiffs' claims must be compelled to arbitration. In its discretion, the Court elects to stay the case pending resolution of the arbitration proceeding. The Court denies the motion in all other respects, without prejudice to re-urging upon lifting of the stay.

### I.    Facts

On April 25, 2022, Defendant HomeSafe marketed and sold a month-to-month home protection plan to Plaintiffs for their personal residence. Defendant Armis is the administrator and obligor of the plan.

A.      HSC

The home protection plan is governed by a Home Service Contract ("HSC").  The HSC is comprised of a "Declarations Page," the "Total Home Plan Agreement – Month to Month," and a "Payment Plan Agreement."  *See* ECF No. 9-1.  The HSC provides that Plaintiffs will make monthly payments in the amount of $79.00 in exchange for repair or replacement coverage of their home's major systems and appliances, as outlined in the contract's terms and conditions.  *Id.* at D1.  *See also id.* §§ E-F (listing covered systems and appliances).  The HSC includes arbitration, forum-selection, and severability provisions.  *Id.* § L.

The Declarations Page contains the names, street address, phone number, and email address of Plaintiffs.  *Id.* at D2.  It is electronically signed by "Saiel Blyden," who is designated as the "Phone Authorized Agent" for "Purchaser" – *i.e.,* Plaintiffs.  *Id.*  It also has a signature line for "Vendor" with "HOMESAFE" typed above it.  *Id.*  The Payment Plan Agreement contains the same identifiable information as the Declarations Page but also includes Plaintiffs' credit card information.  *Id.* at F2.  The Payment Plan Agreement again includes the electronic signature of Saiel Blyden as the "Phone Authorized Agent" above "Purchaser Signature," and the typed word "HOMESAFE" above "Seller Signature."  *Id.*

The HSC contains the following provision governing arbitration and venue:

> Any legal dispute between YOU and US relating to this CONTRACT may be resolved by arbitration. To begin arbitration, either YOU or WE must make a written demand for arbitration within sixty (60) days of OUR final decision. The arbitration will take place before a single arbitrator. It will be administered in keeping with the Conditionally Binding Arbitration Rules ("Rules") of the Better Business Bureau ("BBB") in effect when the Claim is filed. . . . In the event of litigation involving this CONTRACT, venue shall be in the courts of Jefferson County, Colorado. . . . YOU or WE specifically agree to waive and forever give up the right to have any disputes resolved by a trial by jury.

ECF No. 9-1 § L.  The HSC also contains a severability provision: "All provisions of this Agreement shall be considered as separate terms and conditions, and in the event any one shall be

held illegal, invalid or unenforceable, all other provisions hereof shall remain in full force and effect . . . ." *Id.*

### B.     Purchase of HSC

On April 25, 2022, a HomeSafe agent called Plaintiffs on the telephone for the purpose of selling them a home protection plan.  ECF No. 17-1 ¶¶ 3-4, 7 (Affidavit of Rebekah Hall ("Hall")). The call was Plaintiffs' only interaction with HomeSafe prior to purchasing the plan.  *Id.* ¶ 7.  Hall asked the HomeSafe agent during their conversation if HomeSafe was American Home Shield, and the agent stated that it was.  *Id.* ¶ 6.  The HomeSafe agent discussed the monthly financial obligation and the covered systems and appliances under the plan.  *Id.* ¶¶ 10-11.  The agent never discussed appointing a "Phone Authorized Agent" for Plaintiffs.  *Id.* ¶¶ 16-17.  Plaintiffs do not know Saiel Blyden and never authorized him or anyone else to serve as their agent.  *Id.* ¶¶ 18-19. The agent did not discuss the arbitration, forum-selection, or jury trial waiver provisions.  *Id.* ¶¶ 12-14.  Had the agent discussed these provisions, Plaintiffs would not have entered into the HSC. *Id.* ¶ 15.  The agent did not offer Plaintiffs the opportunity to review the HSC, and Plaintiffs did not receive a copy before purchasing the plan.  *Id.* ¶¶ 8-9.

Leo Schonhoff ("Schonhoff"), President of HomeSafe, submitted an affidavit explaining their sales process.  HomeSafe employs individual marketing agents to sell home service plans administered by Armis by telephone.  ECF No. 23-1 at Ex. 1 ¶ 4.  If a consumer wants to purchase a plan, the agent obtains payment information from the consumer and signs a home service contract on their behalf.  *Id.*  As part of its regular business practices, HomeSafe records all sales calls; sends consumers a copy of any purchased home service plan via email and mail on or immediately after the purchase date; and maintains records of these transmittals.  *Id.* ¶¶ 5, 7.

In this case, Hall spoke with a HomeSafe agent named Saiel Blyden ("Blyden"). *Id.* ¶ 6. A transcript of the sales call between Blyden and Hall reflects that Blyden went over the covered systems and appliances, monthly financial obligation, and related service fees, but did not discuss the arbitration, forum-selection, and jury trial waiver provisions. ECF No. 23-1 at Ex. 1-A. Hall later asked Blyden, "Is it the Home Shield, is that what it is?" Blyden answered, "Yes mam. It's HomeSafe. So you're with us with Car Shield. We just cover the home side as well." Hall replied, "Ok. He is going to grab a card." *Id.* Plaintiffs then provided their credit card information to Blyden. *Id.*

### C. Receipt of HSC

According to Schonhoff, HomeSafe's business records reveal that HomeSafe emailed Plaintiffs a copy of the HSC at 6:06 P.M. on April 25, 2022, the day of purchase. ECF No. 23-1 at Ex. 1 ¶ 8. Such records further reveal that HomeSafe sent Plaintiffs a copy of the HSC via first class mail on April 29, 2022, four days after the sale. *Id.* ¶ 9. Plaintiffs did not file an affidavit denying or disputing receipt of the April 25, 2022, email, or the April 29, 2022, first-class mailing, despite being permitted to file a surreply brief.[1] Plaintiffs also did not seek leave to file any further evidence regarding their non-receipt of the HSC, despite direct questioning about this issue during oral argument.

In an affidavit submitted prior to Defendants' submission of Schonhoff's declaration, Hall stated that Plaintiffs "did not receive a written copy of the Plan *before* it was purchased." ECF No. 17-1 at ¶ 8 (emphasis added). Hall also stated that Plaintiffs "demanded a copy" of the HSC from Armis when the dispute arose regarding the claim that is the subject of this lawsuit. *Id.* ¶ 23.

---

[1] Plaintiffs' surreply did not raise any factual challenge to Schonhoff's declaration or the sales call transcript. *See* ECF No. 28.

Plaintiffs admit they received a copy of the HSC from Armis sometime after filing their second claim, but they did not provide an exact or even approximate date of receipt. *Id.* ¶ 24.

### D.    Claims Submitted Under HSC/Monthly Renewal of HSC

According to Armis' records, Plaintiffs made four total claims under the HSC, only one of which is the subject of this lawsuit. First, on July 21, 2022, Plaintiffs submitted a claim for a broken refrigerator, and Armis sent Plaintiffs a check for $771.59 on July 26, 2022. ECF No. 23-1 at Ex. 1 ¶ 12. Second, on December 1, 2022, Plaintiffs submitted a claim for repairs to their home's electrical panel, and Armis sent Plaintiff a check for $404.86 on May 17, 2023. *Id.* ¶ 13. Third, on May 18, 2023, Plaintiffs submitted a claim for repairs to their home's HVAC systems, and Armis sent Plaintiffs a check for $585.00 on September 25, 2023. *Id.* ¶ 14. Finally, on March 18, 2024, Plaintiffs submitted a claim for an oven repair, and Armis sent Plaintiffs a check in the amount of $257.66 on March 21, 2024. *Id.* ¶ 15. As of November 2024, well after Plaintiffs' admitted receipt of the HSC and receipt of multiple financial benefits, Plaintiffs have continued to renew the HSC monthly. *Id.* ¶ 16.[2]

### E.    Current Lawsuit and Pending Motions

On July 19, 2024, nearly four months after receipt of payment on the fourth claim, Plaintiffs initiated this lawsuit in state court. The lawsuit relates only to the second claim submitted by Plaintiffs on December 1, 2022, for repairs to their electrical system. Plaintiffs contend the $404.86 payment was insufficient, and that Defendants breached the agreement and acted in bad faith in relation to this claim.

---

[2] Plaintiffs aver they submitted only three claims. *See* ECF No. 17-1 ¶ 20. This factual dispute is not material to resolving this motion.

Defendants removed the case to federal court and filed the instant motion to compel arbitration and to dismiss.[3]  Defendants request that this Court compel arbitration and then dismiss the case for improper venue, such that any proceedings following remand would proceed in Colorado.  Alternatively, if the Court reaches the merits, Defendants seek dismissal of HomeSafe based on Plaintiffs' failure to state a claim against that entity.

## II.    Motion to Compel Arbitration

Defendants argue that Plaintiffs' claims are subject to the HSC's arbitration provision, because Plaintiffs accepted all terms of the HSC through their acceptance of benefits and other conduct acquiescing to such terms.  Plaintiffs contend they did not agree to the arbitration provision at the time of purchase, and that it must be severed from the HSC.  Alternatively, Plaintiffs argue the arbitration provision is unenforceable due to fraud and unconscionability.  Finally, Plaintiffs argue, even if the arbitration provision is enforceable, Defendants failed to make a timely

---

[3] While briefing this motion, Defendants argued the HSC is governed by the Oklahoma Service Warranty Act, Okla. Stat. tit. 15, §§ 141.1-141.35, which precludes tort claims stemming from a breach of service warranty contract.  ECF No. 23 at 6 (citing Okla. Stat. tit. 15, § 141.24(B)). Plaintiffs then filed a notice of constitutional question pursuant to Federal Rule of Civil Procedure 5.1(a)(1)(A), challenging whether the Oklahoma Service Warranty Act is an unconstitutional special law in violation of Article V, § 46 of the Oklahoma Constitution.  ECF No. 29.  On December 12, 2024, the Court certified Plaintiffs' constitutional challenge to the Oklahoma Attorney General.  ECF No. 32.  On January 8, 2025, Defendants filed a "Notice of Correction of Reply Brief," asserting the HSC is instead governed by the Oklahoma Home Service Contract Act, Okla. Stat. tit. 36. §§ 6750-6755, which does not expressly prohibit bad-faith tort claims.  ECF No. 40.  Defendants still dispute whether a bad-faith claim can be based on a breach of a home service contract, but do not ask the Court to make this determination in deciding the present motion.  ECF No. 40 at 3.  The Court withdrew its certification of constitutional question on February 13, 2025, after Plaintiffs' counsel agreed the constitutional challenge was moot given the filing of Defendants' corrected reply brief.  The Court therefore rules on Defendants' motion without deciding whether the Oklahoma Home Service Contract Act precludes bad-faith claims.

arbitration demand.  The Court held oral argument on January 13, 2025, and the motion to compel arbitration is ripe for determination.[4]

For reasons explained below, the Court finds no genuine dispute of material fact and concludes that Defendants are entitled to compel arbitration as a matter of law.

### A.    FAA Applies to Motion

Defendants seek to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16, and the Oklahoma Uniform Arbitration Act ("OUAA"), Okla. Stat. tit. 12, §§ 1851-1881. The FAA "applies to all arbitration agreements involving commerce, and creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (cleaned up).  This includes federal cases where a court exercises diversity jurisdiction.  *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 271 (1995) (noting Congress intended the FAA to apply in diversity cases).  The phrase "involving commerce" is "broadly construed so as to be coextensive with congressional power to regulate under the Commerce Clause." *Comanche Indian Tribe*, 391 F.3d at 1132 (quotation omitted).  The requirement "reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce." *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 n.7 (1967)).

Applying the above standards, the Court finds the FAA governs the motion to compel arbitration filed in this diversity action.  The HSC is a service contract between citizens of different

---

[4] Although Defendants raise the forum-selection clause for other purposes, Defendants do not seek to enforce the clause for purposes of their motion to compel arbitration.  Instead, both parties urge this Court to decide the motion in this Oklahoma venue.  *See* ECF No. 9 at 3-5; ECF No. 17 at 5-16; ECF No. 23 at 1-10.

states that covers the expenses of repairing or replacing a home's major systems and appliances. This clearly qualifies as a contract "involving commerce" for purposes of the FAA.[5]

## B.    Legal Standards Governing Motions to Compel Arbitration Under FAA

Under the FAA, a written arbitration provision is deemed "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  A party "aggrieved" by the "failure, neglect, or refusal of another to arbitrate" may seek relief from a federal district court.  *Id.* § 4.  The federal court "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  *Id.*

A district court employs a two-step process in determining whether to enforce an arbitration agreement pursuant to 9 U.S.C. § 4.  *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018).  First, it determines whether a valid arbitration agreement exists that provides the movant the right to compel arbitration.  *Id.*  Second, it determines the question of substantive arbitrability, which refers to whether the dispute falls within the scope of the agreement.  *Id.*[6]  *See also infra* Section II.E. (explaining difference between substantive and procedural arbitrability)*.*

In applying the two-step test, a court applies ordinary state-law contract principles.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  A federal court sitting in diversity

---

[5] The Court would apply the same analysis and reach the same conclusion if it applied the OUAA. *See Wohlford v. Am. Auto Shield, LLC*, No. CIV-22-520, 2023 WL 1107891, at *2 (W.D. Okla. Jan. 30, 2023) (noting the standards under both acts are "substantially the same").

[6] Before reaching the second step, a court may sometimes have to decide the "gateway question" of whether the agreement delegates the issue of substantive arbitrability to the arbitrator.  *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023).  Here, neither party contends the HSC delegates the issue of substantive arbitrability, and there is no need to conduct this "gateway" analysis.

applies the choice of law rules of the forum state.  *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994).  When, as here, the contract contains no choice of law provision, the contract "is to be interpreted according to the law and usage of the place where it is to be performed."  Okla. Stat. tit. 15, § 162.  In this case, the place of performance of the HSC is Oklahoma, and the Court applies Oklahoma contract law to the motion.[7]

Courts generally treat motions to compel arbitration akin to motions for summary judgment.  *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014).  The movant "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the [nonmovant] to raise a genuine dispute of material fact regarding the existence of an agreement."  *Id.*  The nonmovant is given "the benefit of all reasonable doubts and inferences that may arise."  *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (quotation omitted).  When "a quick look at the case" reveals "no material disputes of fact," a court can "decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration."  *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014).[8]

### C.    Existence of Valid, Mandatory Arbitration Agreement

Under Oklahoma law, a valid, legally enforceable contract requires: (1) parties capable of contracting; (2) mutual consent, *i.e.,* a meeting of the minds; (3) a lawful object; and (4) sufficient consideration.  Okla. Stat. tit. 15, §§ 2, 51; *Boles v. CarShield, LLC*, No. 22-cv-00034-WPJ-MTS,

---

[7] Both parties apply Oklahoma law in their briefs.

[8] Here, the Court finds no material disputes of fact.  When "material disputes of fact *do* exist," the FAA "calls for a *summary* trial – not death by discovery."  *Id.* (explaining "[p]arties should not have to endure years of waiting and exhaust legions of photocopiers in discovery . . . merely to learn *where* their dispute will be heard").  *See also id.* at 977 ("The object is always to decide quickly – summarily – the proper venue for the case, whether it be the courtroom or the conference room, so the parties can get on with the merits of their dispute.").

2023 WL 8851626, at *4 (N.D. Okla. Dec. 21, 2023).  Relevant to this case, Oklahoma law provides that "[p]erformance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."  Okla. Stat. tit. 15, § 70.  Further, "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all obligations arising from it so far as the facts are known, or ought to be known to the person accepting."  *Id.* § 75.

1.    **Plaintiffs Agreed to Arbitration Provision Through Acts, Conduct, and Acquiescence**

Applying Oklahoma contract law, Oklahoma federal courts have held that "acceptance of an arbitration agreement may be shown by acts, conduct, or acquiescence to the terms of the contract."  *Wohlford v. Am. Auto Shield, LLC*, No. CIV-22-520, 2023 WL 1107891, at *5 (W.D. Okla. Jan. 30, 2023) (quotation omitted); *Boles,* 2023 WL 8851626, at *6.  In *Wohlford*, the plaintiff purchased a month-to-month vehicle service contract ("VSC") via telephone.  2023 WL 1107891, at *1.  The VSC, which contained an arbitration provision, was signed by a "Phone Authorized Agent."  *Id.* at *4.  The defendants presented undisputed evidence that the plaintiff received a copy of the agreement at some point after the purchase.  *See id.* at *3 & n.6.  After the defendants moved to compel arbitration, the plaintiff argued that arbitration should not be compelled because he did not physically sign the VSC, was unaware of the VSC's arbitration provision, and lacked an intent to arbitrate.  *Id.* at *4.  The *Wohlford* court rejected these arguments and found a valid agreement. The court explained that neither the FAA nor Oklahoma law requires a physical signature to accept a contract; instead, acceptance can be shown through performance or the receipt of benefits.  *Id.* at *5 (citing Okla. Stat. tit. 15, §§ 70, 75).  The court found the plaintiff accepted the terms of the VSC "by making payments under the VSC, not cancelling the VSC, and by submitting a repair claim under the VSC," despite not signing the agreement or being aware of the arbitration

provision prior to purchase. *Id. See also Boles*, 2023 WL 8851626, at *5-6 (citing *Wohlford*, employing nearly identical reasoning, and concluding plaintiffs accepted terms of arbitration provision through their conduct after receipt of the agreement).

The Court finds the reasoning in *Wohlford* and *Boles* persuasive and directly applicable here. Defendants met their burden of showing that, based on their business records and standard business practices, HomeSafe emailed and mailed a copy of the HSC to Plaintiffs on or near the time of purchase on April 25, 2022. As in *Wohlford* and *Boles*, the evidence shows that, although Plaintiffs did not physically sign the agreement, they acquiesced to all terms of the HSC through their conduct. Specifically, Plaintiffs purchased the HSC; renewed it monthly for several years and continue to do so; filed at least three claims under the HSC; admittedly received financial benefits from those claims; and filed suit seeking to enforce the provisions of the HSC requiring payment. Plaintiffs could have chosen to cancel or non-renew the HSC at any time for any reason. ECF No. 9-1 §§ B(2), K(3). Instead, Plaintiffs continued submitting claims and demanding performance under the HSC, and they cannot avoid their corresponding obligations, including the agreement to arbitrate.[9]

Plaintiffs have failed to create any genuine questions of material fact regarding the existence of an arbitration agreement. Plaintiffs' arguments and factual averments focus on the parties' conduct prior to Plaintiffs' purchase of the HSC. Specifically, Plaintiffs contend (1) the

---

[9] As discussed at the hearing, there is a difference between this case and the *Wohlford* and *Boles* decisions. The contracts in those cases included a provision that states, "BY MAKING YOUR FIRST PAYMENT . . . , YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION . . . , AND YOU AGREE TO BE BOUND BY THE TERMS OF THIS CONTRACT." *Wohlford*, 2023 WL 1107891, at *4; *Boles*, 2023 WL 8851626, at *2. While this type of provision would have been helpful to Defendants' position, its absence is not fatal. The crucial reasoning in *Wohlford* and *Boles* is that the plaintiffs accepted the terms of the arbitration provision by repeatedly renewing the contract and making claims under the contract. That reasoning applies equally here.

HomeSafe agent failed to inform them of the arbitration provision or their waiver of jury trial rights; (2) Plaintiffs failed to authorize Blyden to sign as their agent; and (3) Plaintiffs failed to see or review the HSC *before* making the purchase. *See* ECF No. 17-1 ¶¶ 8-19. *See also* ECF No. 17 at 8 (arguing in their response brief that they were not provided a copy of the HSC *at the time of contracting*). Accepting these facts and arguments as true, they are not material to the existence of a valid agreement, where Plaintiffs accepted the HSC through post-purchase acts, conduct, and acquiescence. As explained above, acceptance occurred based on Plaintiffs' receipt of the HSC combined with the continued renewal of the contract, filing of multiple claims, and receipt of financial benefits. Any factual disputes regarding what did or did not occur prior to purchase are not material.

It is unclear whether Plaintiffs attempt to create a dispute of fact regarding the precise date of their receipt of the HSC, or if they contend this fact is material to the legal analysis. The Court addresses this out of an abundance of caution. Defendants presented undisputed evidence, attached to the reply brief, that Armis sent the HSC to Plaintiffs by email and first-class mail on or around the date of purchase. This is consistent with its regular business practices. Despite an opportunity to do so in a surreply, or following specific questioning on this issue during oral argument, Plaintiffs failed to submit evidence denying receipt of the email or first-class mail or otherwise attempting to refute Defendants' evidence. In fact, in their surreply, Plaintiffs failed to make any arguments at all about the timing of their receipt of the HSC, *i.e.,* when they first had the opportunity to review the arbitration provision. Plaintiffs' silence in response to this specific evidence indicates Plaintiffs checked their records and cannot refute Defendants' statements, or intentionally avoided attempting to do so. In either event, there is no genuine question presented for trial. The Court therefore finds Plaintiffs received the HSC, by email and mail, on or around

the date of purchase on April 25, 2022. *See Wohlford*, 2023 WL 1107891, at *3 n.6 (reasoning that

the plaintiff "had the opportunity to demonstrate to the Court he was not timely provided the VSC

and has failed to do so"); *Ivy Bridge v. Nature's Sunshine Prods., Inc.*, No. 2:21-CV-495, 2022 WL

604857, at *4 (D. Utah Mar. 1, 2022) (rejecting plaintiffs' argument that there was no valid and

enforceable arbitration agreement where defendant submitted declaration that documents were

emailed to plaintiffs and plaintiffs did not submit a declaration stating the documents were not

received). As in *Wohlford* and *Boles*, Plaintiffs knew or should have known of the arbitration

provision based on receipt of the HSC in April 2022.

Hall's original affidavit does not address the issue of receipt and does not create a genuine

question of material fact. As an initial matter, the affidavit was submitted prior to Defendants'

submission of direct evidence regarding HomeSafe's emailing and mailing of the HSC in April of

2022. Plaintiffs have not denied receipt of these documents, despite opportunities to do so. Even

in the original affidavit, Hall carefully does not aver when Plaintiffs first *received* the HSC. Nor

does Hall provide a specific date as to when Plaintiffs first *reviewed* the HSC. Hall merely states

they did not *receive* the HSC *before purchase*; that they *demanded* the HSC after filing their second

claim; and that they first *reviewed* the HSC at some time after making the second claim. ECF No.

17-1 ¶¶ 8, 23-24. *See also* ECF No. 17 at 3 (arguing that Plaintiffs did not *review* the HSC until

after filing their second claim). Even giving Plaintiffs the benefit of reasonable inferences, these

vague statements do not adequately contradict Defendants' evidence demonstrating mailing and

presumed receipt on or around April 2022.

### 2.    Arbitration Provision Is Mandatory

Plaintiffs argue that the arbitration provision here is permissive because the provision states

that a dispute "may" be resolved by arbitration. ECF No. 17 at 15.

As discussed at the hearing, the contracts in *Wohlford* and *Boles* included an "Individual State Variance Requirement" for Oklahoma, which stated that, "[w]hile arbitration is mandatory, the outcome of any arbitration shall be non-binding . . . , and either party shall, following arbitration, have the right to reject the arbitration award and bring suit in the district court." *Wohlford*, 2023 WL 1107891, at *3; *Boles*, 2023 WL 8851626, at *4. This supplemental language's use of the word "mandatory" supported the conclusion that the arbitration provisions were mandatory, rather than permissive, despite use of the word "may" in the contracts. *See Wohlford*, 2023 WL 1107891, at *3; *Boles*, 2023 WL 8851626, at *4. Here, the HSC mentions a presumably similar state variance requirement, but the variance is not attached to the HSC. *See* ECF No. 9-1 § L ("Please refer to the 'Individual State Variance Requirement' at the end of YOUR CONTRACT for any added requirements in YOUR state.").

While the variance language would support a finding that the HSC's arbitration provision is mandatory, such language is not required for such finding. Interpreting similar provisions, which were also unaccompanied by any supplemental language, courts have routinely held that arbitration provisions are mandatory despite use of the word "may." *See Mbau v. Baker Hughes, Inc.*, No. 18-CV-101-JED-FHM, 2018 WL 3484041, at *2 (N.D. Okla. July 19, 2018) (collecting cases). Instead, courts have held that the most logical reading of these provisions is that arbitration becomes mandatory once either party elects to request it. *See Mbau*, 2018 WL 3484041, at *2 (finding arbitration clause that stated parties "may elect" to submit a dispute to arbitration becomes mandatory once arbitration is initiated); *Pueblo of Isleta v. Grisham*, No. 17-654, 2019 WL 1429586, at *15 (D.N.M. Mar. 30, 2019) (explaining that use of "may" in arbitration provision "simply means" that arbitration is "mandatory once either party invokes it") (collecting cases); *Smith v. AHS Okla. Heart, LLC*, No. 11-CV-691-TCK-FHM, 2012 WL 3156878, at *1 (N.D. Okla.

14

June 6, 2012) (finding arbitration clause that stated parties "may submit" dispute to arbitration meant that, "if one party elects to proceed to arbitrate the dispute, then the other party must also submit to arbitration").  The Court's conclusion is further supported by the HSC's "Class Action Waiver" provision, which states, "The parties expressly waive any ability to maintain any Class Action in any forum. . . . **THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION, HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION."**  ECF No. 9-1 § L.  Interpreting the plain language of the agreement, the Court concludes the arbitration provision is mandatory when invoked by either party, despite the absence of certain additional language relied on by the courts in *Wohlford* and *Boles*.

### 3.    Court Rejects Plaintiffs' Fraud/Unconscionability Defenses

#### a.    Fraudulent Inducement

Plaintiffs argue they were fraudulently induced into the arbitration provision, because arbitration was not discussed when they purchased the HSC.  ECF No. 17 at 8-13.  Such argument is premised upon a theory of constructive fraud.

"Constructive fraud is a breach of either a legal or equitable duty that does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Key Fin., Inc. v. Koon*, 371 P.3d 1133, 1138 (Okla. Civ. App. 2015).  "It may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage for the actor by misleading another to his prejudice." *Id.*  Constructive fraud can occur where a party has a duty to speak but remains silent. *Id.  See also Bankers Trust Co. v. Brown*, 107 P.3d 609, 613 (Okla. Civ. App. 2004) ("Constructive fraud is 'the concealment of material facts which one is bound under the circumstances to

disclose.'") (quoting *Varn v. Maloney*, 516 P.2d 1328, 1332 (Okla. 1973)).  Silence regarding a material fact does not, by itself, trigger the duty to speak.  *See Key Fin., Inc.*, 371 P.3d at 1138 ("[S]ilence as to a material fact is not necessarily, as a matter of law, equivalent to a false representation; there must have been an obligation to speak.").  The duty to speak instead arises only "when the offending party created a *false impression* concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party."  *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 855 (Okla. 2020) (emphasis added).  Stated differently, the duty to speak "may arise from partial disclosure" only when the speaker "convey[s] a false impression by the disclosure of some facts and the concealment of others," because "such concealment is in effect a false representation that what is disclosed is the whole truth."  *Id.* (quotation omitted).  In determining whether one had a duty to speak, "consideration must be given to the situation of the parties and the matters with which they are dealing."  *Silk v. Phillips Petrol. Co.*, 760 P.2d 174, 179 (Okla. 1988).

Defendants are entitled to summary judgment on the issue of whether the arbitration provision was fraudulently induced by Defendants' silence.[10]  There is no evidence suggesting Blyden created a false impression regarding the arbitration provision.  Plaintiffs do not, and cannot, point to any partial disclosures regarding the HSC's arbitration provision.  Hall concedes that Blyden did not mention arbitration at all.  *See* ECF No. 17-1 ¶ 12 ("HomeSafe never explained arbitration or even mentioned the word 'arbitration' to us.").  Based on Blyden's silence on the issue of arbitration, Plaintiffs were not fraudulently induced into entering the HSC.

---

[10] It is not disputed that the arbitration provision is material and undisclosed.  The parties' dispute turns on whether Blyden had a duty to speak.

Plaintiffs argue that, once Blyden discussed "any material part" of the HSC, he "had a duty to discuss all material parts," including the arbitration provision, to avoid misleading Plaintiffs. ECF No. 17 at 20. This argument is unpersuasive. The duty to speak only arises once an individual "voluntarily chooses to speak . . . about a particular subject matter." *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1181 (10th Cir. 2008) (quotation and emphasis omitted) (applying Oklahoma law). Because Blyden did not discuss arbitration, he did not create a false impression regarding that provision and was under no duty to speak, even though he discussed other material provisions of the contract. *See Sutton*, 475 P.3d at 858 ("The duty to disclose . . . is not a duty to read an entire contract; it is the duty to disclose enough information that will clear the false impression created, which under the circumstances, only concerned the [dispute resolution clause]"). Here, no false impression was created, and Blyden had nothing to clarify.

Plaintiffs' cited cases are distinguishable. They involve the creation of a false impression and/or specific misrepresentations. *See* ECF No. 17 at 9-12 (citing, *e.g., Sutton*, 475 P.3d at 847; *Key Fin., Inc.*, 371 P.3d at 1133). In *Key Finance*, the plaintiff purchased a vehicle from a car dealership and signed an arbitration agreement. 371 P.3d at 1135. The dealership's agent stated the arbitration agreement awarded attorney fees to the dealership if the plaintiff defaulted on payments and litigation was necessary, but he did not state that the agreement limited the plaintiff's rights to a jury trial. *Id.* at 1136, 1138. The Oklahoma Court of Civil Appeals found the agent owed plaintiff a duty of full disclosure, because his representation "conveyed a false impression of the purpose and content" of the arbitration agreement by only stating the document awarded attorney fees if litigation was necessary. *Id.* at 1138. Unlike the agent in *Key Finance* who partially explained the arbitration agreement, Blyden made no mention of the HSC's arbitration provision.

17

*Sutton* likewise involved a vehicle purchase at a car dealership.  475 P.3d at 849.  In that case, the plaintiff executed a two-page purchase agreement that was divided into four separate sections, each with its own signature line.  *Id.* at 850.  Under the "trade-in vehicle" section was a dispute resolution clause in small, red font.  *Id.*  The dealership's finance manager told plaintiff the purchase agreement was for "verifying his personal information, the vehicle information on both vehicles, and how much he would be paying."  *Id.*  The finance manager did not discuss the dispute resolution clause, and plaintiff did not read the purchase agreement before signing.  *Id.*  Under these facts, the Oklahoma Supreme Court found a duty to disclose the dispute resolution clause arose, because "the representations of the finance manager combined with the structure of the purchase agreement created a false impression that the purpose of [plaintiff's] signature was to only verify information concerning his trade-in vehicle."  *Id.* at 857 (noting arbitration provision was a "totally unrelated provision" in a "much smaller font size" that was "tucked-in" right before a signature line).

Unlike the agent in *Sutton*, Blyden did not create any false impression that induced Plaintiffs not to carefully read the entire agreement upon its receipt.  Blyden's failure to mention the arbitration provision is distinguishable from an indication by a finance manager that a document's *sole purpose* is to verify personal information.  Such representation may induce a purchaser to sign an agreement without reading or neglect reading if, as here, the agreement is received later.  Further, unlike the dispute resolution clause in *Sutton*, the HSC's arbitration provision is not hidden.  It is in standard font within the substantive portion of the HSC in a section entitled, "DISPUTES."  ECF No. 9-1 § L.  Here, Blyden's silence regarding the arbitration

provision did not trigger the duty to disclose, and Plaintiffs' fraudulent inducement argument fails.[11]

### b.    Unconscionability

Plaintiffs argue the arbitration provision is unconscionable**,** because (1) it is contained in an adhesion contract;[12] (2) it forces them to unknowingly waive their right to a jury trial; and (3) arbitration may be costly.  ECF No. 17 at 13-15.

Under Oklahoma law, "[t]he basic test of unconscionability of a contract is whether under the circumstances existing at the time of making . . . the contract . . . , clauses are so one-sided as to oppress or unfairly surprise one of the parties." *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976)).  "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party." *Id.*

The Court concludes the HSC's arbitration provision is not unconscionable.  First, the arbitration provision was not in fine print and was in the same font as other portions of the agreement.  Applying Oklahoma law, courts have consistently found that similar arbitration provisions in "adhesion" contracts are not so unfair or one-sided as to be deemed unconscionable. *See Lloyd v. Northrop Grumman Sys. Corp.*, No. CIV-07-887, 2008 WL 320021, at *3 (W.D. Okla.

---

[11] In *Sutton*, the Oklahoma Supreme Court found plaintiff's failure to read the purchase agreement was not a defense to defendant's failure to disclose.  475 P.3d at 857-58.  The holding in *Sutton* is not applicable to this case, as the Court finds there was no duty to disclose in the first instance.

[12] An adhesion contract is a "standardized contract prepared entirely by one party to the transaction for the acceptance of the other. These contracts, because of the disparity in bargaining power . . . , must be accepted or rejected on a 'take it or leave it' basis without opportunity for bargaining." *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 p.2d 861, 864 (Okla. 1996).  Adhesion contracts are not *per se* unconscionable.  *See Towe Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 597 (Okla. Civ. App. 1997) (explaining adhesion contracts "are not in themselves illegal or inequitable"); *Freeman v. Bodyworks, Inc.*, 213 P.3d 838, 840 (Okla. Civ. App. 2008) (noting adhesion contracts are enforceable, "although often annoying").

Feb. 4, 2008) (finding arbitration provision in adhesion contract was not unconscionable where provision was not "hidden in a maze of fine print" but was contained within "[t]wo clearly written documents").  *See also Boles*, 2023 WL 8851626, at *5-6 (finding near-identical arbitration provision was not unconscionable); *Lockett v. Conn Appliances, Inc.*, No. 16-CV-703, 2017 WL 2129316, *4 (E.D. Tex. Apr. 11, 2017) (same), *report and recommendation adopted*, 2017 WL 2120010 (May 16, 2017) (applying Oklahoma law); *Towe Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 597 (Okla. Civ. App. 1997) (same).  Plaintiffs did not cite any contrary authority finding similar arbitration provisions unconscionable, and the Court follows the above-cited authority.

Second, Plaintiffs inflate the significance of the HSC's jury trial waiver provision.  All arbitration agreements in effect waive the right to jury trial.  *See Busby v. Adams Homes, LLC*, No. 12CV92, 2012 WL 12884479, at *5 (S.D. Miss. July 24, 2012) (explaining "[a]ll valid arbitration agreements constitute the waiver of the right to a jury trial").  However, as noted above, these provisions are routinely enforced.

Finally, it is Plaintiffs' burden to show arbitration would be "prohibitively expensive." *Shahin v. J and L Acquisitions, LLC*, No. CIV. 24-424, 2024 WL 4804080, at *4 (W.D. Okla. Nov. 15, 2024).  The only evidence before the Court indicates that arbitration would cost $150 to initiate and could be done remotely.  ECF No. 23-1 at Ex. 1 ¶¶ 17-18.  Plaintiffs' concerns about costs are merely speculative.

The Court finds the arbitration provision is not so one-sided as to oppress or surprise Plaintiffs.

### D.   Claims Fall Within Scope of Arbitration Agreement

Having found a valid, mandatory arbitration agreement exists between the parties, the

second step is to determine whether their dispute falls within the scope of the agreement. The Court first categorizes the arbitration provision as broad or narrow. *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005). If the Court finds the arbitration provision is narrow, it then determines whether the dispute "is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains an arbitration clause." *Id.* (quotation omitted). Collateral matters are generally beyond the purview of a narrow arbitration clause. *Id.* If the Court finds the arbitration provision is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (quotation omitted).

The arbitration provision provides that "*[a]ny legal dispute* between YOU and US *relating to this CONTRACT* may be resolved by arbitration." ECF No. 9-1 § L (emphasis added). This language is consistent with a broad arbitration clause. *See Wohlford*, 2023 WL 1107891, at *1 n.3 (finding arbitration clause broad where parties agreed to arbitrate "any legal dispute . . . relating to" the VSC). *See also Prima Paint Corp.*, 388 U.S. at 398 (same, where parties agreed to arbitrate "[a]ny controversy or claim arising out of or relating to" agreement or breach of agreement); *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (same, where parties agreed to arbitrate "[a]ny controversy, claim, or breach arising out of or relating to" agreement). Accordingly, a presumption of arbitrability is applied to Plaintiffs' claims. This presumption is "overcome only if [the Court] can say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Soc'y of Pro. Eng'g Emps. in Aerospace v. Spirit Aerosystems, Inc.*, 681 F. App'x 717, 721 (10th Cir. 2017) (citation and internal quotation marks omitted).

Plaintiffs concede their breach of contract claim is within the scope of the arbitration provision. Plaintiffs argue in a footnote that their claim for breach of the duty of good faith and fair dealing is an "extra-contractual" tort claim and therefore outside the scope of the arbitration provision. ECF No. 17 at 5 n.3.[13] This argument is unpersuasive. Plaintiffs' tort claim is based on Defendants' purported mishandling of Plaintiffs' claim for benefits under the HSC. ECF No. 9-2 ¶¶ 30-32 (petition). Plaintiffs generally allege that Defendants refused to pay benefits Plaintiffs were legally entitled to under the HSC; intentionally and recklessly misapplied provisions of the HSC to avoid payment; and failed to properly evaluate and investigate Plaintiffs' claim for benefits under the HSC. *Id.* ¶ 32. Plaintiffs' tort claim is clearly premised on a dispute "relating to the" HSC. *See P & P Indus, Inc.*, 179 F.3d at 871-72 (finding tortious interference claim arbitrable where underlying factual allegations of claim "touch[ed] matters" covered by the contract) (rejecting argument that tort-based claims can never fall within the scope of a "arising out of or relating to" arbitration clause). All of Plaintiffs' claims fall within the scope of the broad arbitration provision. *See Boles*, 2023 WL 8851626, at *8 (finding fraudulent inducement and breach of duty of good faith and fair dealing claim within scope of arbitration provision and compelling claims to arbitration); *Wohlford*, 2023 WL 1107891, at *6 (same).

**E.     Timeliness of Defendants' Demand for Arbitration Must Be Decided by Arbitrator**

Plaintiffs argue Defendants failed to make a timely written demand for arbitration. ECF No. 17 at 15-16. Defendants argue this issue must be decided by the arbitrator, and, alternatively, that its claim was timely. ECF No. 23 at 9.

---

[13] Although the Court chooses to address this argument, arguments raised in footnotes are typically waived. *See Eisenach v. Life Ins. Co. of N. Am.*, No. 13-CV-82, JED-PJC, 2013 WL 4483058, at *7 (N.D. Okla. Aug. 19, 2013). Counsel is cautioned against raising substantive arguments in footnotes.

Unless otherwise agreed to by the contracting parties, courts decide issues of "substantive arbitrability," while arbitrators decide issues of "procedural arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002). Substantive arbitrability looks to "whether there is a contractual duty to arbitrate at all" – *i.e.,* "whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34-35 (2014) (citation, internal quotation marks, and emphasis omitted). Procedural arbitrability "determines when the contractual duty to arbitrate arises." *Id.* at 35 (emphasis omitted). Procedural arbitrability issues include matters of "waiver, delay, or a like defense to arbitrability" and "the satisfaction of prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." *Id.* at 35 (citation and internal quotation marks omitted).

Whether Defendants timely demanded arbitration is an issue of procedural arbitrability that must be decided by the arbitrator. The arbitration provision states, "[t]o begin arbitration, either YOU or WE must make a written demand for arbitration within sixty (60) days of OUR final decision." *See* ECF No. 9-1 § L. "Final decision" is not defined in the HSC, and the parties differ on the meaning and application of this requirement. Plaintiffs' timeliness argument concerns when the duty to arbitrate is triggered, rather than whether such an obligation exists at all. Such issue is properly reserved to the arbitrator. *See Com. Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 339 n.5 (5th Cir. 1984) ("[M]atters of procedural arbitrability, such as . . . whether the request for arbitration was timely under the arbitration agreement, are for the arbitrator to decide."); *Conticommodity Servs., Inc. v. Philipp & Lion*, 613 F.2d 1222, 1227 (2d Cir. 1980) (finding that, absent express language to the contrary, "the timeliness of a demand for arbitration . . . is to be determined by the arbitrator."); *Cent. Jersey Freightliner, Inc. v. Freightliner Corp.*, 987

F. Supp. 289, 293, 301 (D.N.J. 1997) (same); *Ercon Corp. v. Gibbs Constr., L.L.C.*, No. 04-1071, 2005 WL 8174295, at *1, *4 (W.D. La. Feb. 11, 2005) (same), *report and recommendation adopted* (Mar. 7, 2005).

In sum, the Court concludes: (1) Plaintiffs agreed to a valid, mandatory agreement to arbitrate, and such agreement was not fraudulently induced or unconscionable; (2) Plaintiffs' claims fall within the scope of the arbitration provision; and (3) the arbitrator must decide the issue of the timeliness of the arbitration demand. Therefore, the Court compels arbitration in accordance with this Opinion and Order.

## III. Motion to Dismiss for Improper Venue

Defendants argue the Court should dismiss this case, rather than institute a stay, because the HSC's forum-selection clause provides that, "[i]n the event of litigation involving this CONTRACT, venue shall be in the courts of Jefferson County, Colorado." ECF No. 9 at 5-7.

The FAA instructs that, upon finding the matter arbitrable, the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. *See also Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all claims are subject to arbitration."). However, the FAA permits dismissal if "there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration." *Id.* at 476 n.2.

Here, Defendants raise a separate ground for dismissal other than arbitrability – namely, improper venue due to the forum-selection clause. However, the parties contest whether this provision is mandatory or permissive. Further, the Court has concerns that Defendants waived their right to enforce the clause by asking the Court to compel arbitration in this Oklahoma venue,

rather than seeking transfer to Colorado in the first instance. *See NLM Servs., LLC v. K1 Speed Franchising, Inc.*, No. 23-cv-1777, 2023 WL 11887252, at *2 (D.S.C. June 27, 2023) (finding defendant waived contractual provision mandating venue in the courts of Orange County, California, when it sought to compel arbitration in South Carolina District Court). Rather than resolve these issues now, the Court elects to stay the proceedings and reach these issues only if necessary at a later time. Defendants may re-urge this ground for dismissal upon remand from the arbitration proceedings.[14]

## IV.    Conclusion

Defendants' Motion to Compel Arbitration and to Dismiss (ECF No. 9) is **GRANTED IN PART** and **DENIED IN PART**. The motion to compel arbitration is granted, and the motion is denied in all other respects.

Pursuant to LCvR 41-1, the Court Clerk is directed to administratively close the case pending either an Order of the Court reopening the proceedings, or dismissal of the action with prejudice by stipulation of the parties.

**SO ORDERED** this 6th day of March, 2025.

**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

---

[14] Defendants also move to dismiss HomeSafe as a party pursuant to Federal Rule of Civil Procedure 12(b)(6), in the event the Court declines to compel arbitration and declines to dismiss for venue. The Court need not reach this alternative argument at this time. The Rule 12(b)(6) motion is denied without prejudice to re-urging upon remand from the arbitration proceedings.